**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

Plaintiff,

v.

OTIS WORLDWIDE CORPORATION AND
OTIS ELEVATOR COMPANY,

            Defendants

Civil Action No. 1:23-CV-10612-MIJ

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

**DATED: July 1, 2026**

Respectfully submitted,

OTIS WORLDWIDE CORPORATION and
OTIS ELEVATOR COMPANY,

/s/ *Emily J. Miller*

Emily J. Miller (BBO No. 705662)
emmiller@seyfarth.com
Abigail D. Skinner (BBO No. 709705)
askinner@seyfarth.com
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 1200
Boston, MA 02210-2028
Telephone:   (617) 946-4800
Facsimile:    (617) 946-4801

Andrew L. Scroggins (*pro hac vice*)
ascroggins@seyfarth.com
Sarah Bauman (*pro hac vice*)
sbauman@seyfarth.com
SEYFARTH SHAW LLP
233 South Wacker Drive, Suite 8000
Chicago, Illinois 60606-6448
Telephone:   (312) 460-5000
Facsimile:    (312) 460-7000

326917158

Defendants Otis Elevator Company and Otis Worldwide Corporation (collectively "Otis") submit this Memorandum of Law in support of their Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

## I.    INTRODUCTION

This case concerns the appropriate balance between the essential functions of a safety-sensitive job and an employee's disability-related limitations.

Charging Party Cameron Bateman was a union-represented Assistant Elevator Mechanic working for Otis Elevator in its Construction Department. Bateman's role placed him at busy, noisy construction sites, working alongside Otis employees in or near elevator shafts, at heights, and near hazardous mechanical equipment—all while other trades employed by other entities performed their own work at the site.

Shortly after Bateman accepted the Construction Department job, he told Otis that he had a hypersensitivity to busy, loud, and discordant environments that affected his concentration and made it hard for him to distinguish between competing voices and sounds. On separate occasions, he asserted that his work environment was "not safe" and "problematic," and he reported "two potentially very unsafe situations." Bateman's medical provider advised that his condition "makes it particularly dangerous in environments where there is a potential for physical harm, as he may not be able to distinguish someone calling or warning him of an immediate danger, or not in time." After Otis began the accommodation process, Bateman reported that, weeks earlier, he had suffered an on-the-job injury caused by his failure to hear a warning call from a coworker at a construction site. Bateman subsequently sought treatment for the injury that left him unable to perform his duties as Assistant Elevator Mechanic in the Construction Department for more than four months.

While the Plaintiff Equal Employment Opportunity Commission ("EEOC") contends that Otis failed to accommodate Bateman and that it retaliated against him for requesting an

1

accommodation, the undisputed record reflects that Otis tried hard to find a reasonable accommodation for Bateman. While Otis was able to assign Bateman some temporary work that had arisen with an adjuster immediately following his request for an accommodation, that work was short-term and finite, and Otis was unable to identify a permanent workable accommodation for Bateman before he abruptly resigned. There was no way for Bateman to do his job without endangering himself or others or without creating an undue hardship for Otis. The EEOC's claims, therefore, fail as a matter of law and should be dismissed.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

Otis is the world's largest elevator manufacturer, and it employs more than 70,000 people worldwide. SOF ¶1. Given the inherently hazardous nature of the work its people perform, Otis places paramount importance on workplace safety. *Id.* ¶3. This commitment includes, among other things, ensuring that employees in safety-sensitive roles are able to perform their duties without posing a risk to themselves or others. *Id.* ¶.

On February 8, 2021, Cameron Bateman began working as an Assistant Mechanic in the Construction Department at Otis's Canton, Massachusetts branch after responding to a job notice from his union, the International Union of Elevator Constructors Local 4 ("Local 4"). *Id.* ¶4. Assistant Mechanics perform physically demanding work supporting the installation of new elevator systems at active construction sites, requiring sustained concentration and coordination. *Id.* ¶¶6-7. The work is conducted in dynamic, noisy environments alongside multiple trades. *Id.* ¶6. Essential functions include maintaining a high level of concentration and lifting up to 100 pounds. *Id.* ¶7.

Nine days into his employment, on February 17, 2021, Bateman used Otis's myHR portal (an intranet HR support system that provides employees with a self-service platform to request certain Human Resource actions and functions) to initiate a request for accommodation for his

---

[1] Otis submits additional undisputed material facts in the separately filed Local Rule 56.1 Statement of Undisputed Facts.

Attention-Deficit/Hyperactivity Disorder ("ADHD") and Autism Spectrum Disorder ("ASD"). *Id.* ¶19. That same day, a myHR representative emailed Bateman a standard ADA Accommodations Request form ("ADA Paperwork") to be completed by his physician. *Id.* ¶20. On March 9, Bateman responded to myHR's email, requesting that the accommodation process begin before his healthcare provider completed the ADA Paperwork because he was not yet insured. *Id.* ¶22. He also stated his "situation [at work] currently is not safe" because there were other trades at his worksite[2] that were "disruptive" and made it "hard to hear things." *Id.* ¶¶22, 26. The myHR representative renewed the request that Bateman submit information from his medical provider in order to facilitate those discussions. *Id.* ¶24.

Between April 1 and 7, 2021, Bateman submitted ADA Paperwork completed by his physician, Dr. Stephanie Craig, to Otis. *Id.* ¶¶31. Dr. Craig provided this description of Bateman's disability-related limitations:

> Mr. Bateman is having difficulty concentrating on the intricacies of his job when there is a lot of conversation and commotion surrounding him. Additionally . . . his hypersensitivity to sound and difficulty distinguishing critical auditory stimuli makes it difficult to distinguish which voices or noises it is important to attend to – like selecting which channel to listen to. ***He may not be able to distinguish someone calling or warning him of an immediate danger.***
>
> ***Mr. Bateman's difficulty sorting out which voices or noises to attend to makes it particularly dangerous in environments where there is a potential for physical harm, as he may not be able to distinguish someone calling or warning him of an immediate danger, or not in time.***

*Id.* ¶¶34-35 (emphasis added). Dr. Craig offered the following regarding possible accommodations:

> Mr. Bateman has thrived in environments where he can work somewhat apart from on-going conversation such as a separate room, or other location apart from other

---

[2] When Otis has a job on a construction site, other trades, such as electricians, plumbers, steamfitters, sheet metal workers, and carpenters who are not under Otis's management, may be present working at the site. *Id.* ¶¶27-28. The general contractor decides what work is performed at the site in any given time, and Otis cannot control which trades might be on site working alongside Otis. *Id.* ¶28. Further, Otis may not know which other trades will be on site working alongside Otis employees on any given day. *Id.*

workers' conversations. It is recommended that he be re-assigned to a role or environment with fewer competing auditory inputs, vocal or otherwise.

*Id.* ¶36.

On April 7, 2022, Jeanie Demshar, Director of Labor and Employee Relations for Otis, received Bateman's completed ADA Paperwork from myHR. *Id.* ¶37. Demshar found the limitations provided by Dr. Craig to be "very restrictive" given the "very dangerous" "nature of the elevator industry," where Assistant Mechanics are working in teams, "at heights," and "next to live electrical equipment," in "noisy" environments with "a lot of workers around." *Id.* ¶39. She testified:

> The fact that [Bateman's] [] own doctor said that he has trouble distinguishing noises, [and is un]able to warn somebody. Again, he couldn't work alone [under state law] because he wasn't a licensed mechanic in the state, so he'd be working with a team member. You have to be able to communicate, to warn your coworkers about a danger, a potential hazard. The way that ADA [Paperwork] was written gave me concern that he may not be able to work safely.

*Id.* ¶40. Demshar nonetheless immediately began a months-long interactive process to try to identify an accommodation for Bateman, engaging with Bateman, his healthcare providers, Otis employees, and Otis's consulting physician, Dr. John Longphre. *Id.* ¶¶43-132. All agreed Bateman could not safely perform the duties of an Assistant Mechanic in Construction. *Id.* ¶¶41, 42, 45, 55. In addition, Jim Nelson, Jack Owens, Dave Martin, and Nicole Komberack, supervisors in the Construction Department, discussed Bateman's needs during weekly "manpower meetings,"[3] arriving 30 minutes early to explore possible workable assignments for Bateman. *Id.* ¶¶57-58. To try to accommodate Bateman, Construction supervisors assigned him temporary work with an adjuster in April and May 2021.[4] *Id.* ¶59. Nelson also assigned Bateman to any available independent tasks, such as preparing materials rather than working in the elevator shaft. *Id.* ¶66.

---

[3] In 2021, Mechanics and Assistant Mechanics employed in the Canton Construction Department were assigned work during these meetings, as manpower needs fluctuated significantly from week to week. *Id.* ¶¶16-17.

[4] According to Nelson, Bateman complained about the travel required for that role, leaving Nelson with the impression that he did not enjoy the assignments. *Id.* ¶65.

On May 9, 2021, while Otis was searching for a permanent accommodation, Bateman reported a March 9, 2021 injury—three fractures to his foot—via text to Nelson, claiming the injury was caused by his failure to hear a warning call from a coworker at a construction site. *Id.* ¶¶67, 69. In his text, Bateman also complained that he had repeatedly raised communication as a safety issue. *Id.* ¶70. After he reported the injury and a workers' compensation claim was filed, Otis placed Bateman on light duty, consisting of non-elevator (and non-bargaining unit) tasks such as sorting warehouse materials. *Id.* ¶¶77-78. The claim was ultimately denied because no witnesses corroborated Bateman's account of the incident. *Id.* ¶76.

On May 19 and 20, 2021, Demshar, Jack Owens (General Manager, Canton Branch), Lyssette Ciardiello (Workers' Compensation Risk Manager), and the Operations and Safety Managers met to discuss Bateman's accommodation request, workers' compensation matter, and foot-related medical restrictions limiting him to "desk work only." *Id.* ¶79. They determined Otis could no longer maintain him on light duty and would place him on leave while he recovered from his foot injury. *Id.* Owens communicated this decision to Bateman on May 20. *Id.* ¶80.

In May and June 2021, Bateman submitted multiple physician's notes with conflicting restrictions and return-to-work dates related to the foot injury. *Id.* ¶¶81-92. A May 27 note cleared him for "full duty" as of June 1, while a note received the next day from a different physician set a June 21 return date. *Id.* ¶¶82, 83. On July 8, another note cleared him for full duty with rest breaks, but on July 26, a fourth provider reported that Bateman had experienced falls due to his foot injury and recommended continued light duty, including no stair climbing and only work outside active construction zones. *Id.* ¶¶87, 92. Bateman concedes these July 26 restrictions were incompatible with the duties of an Assistant Mechanic. *Id.* ¶93.

Otis requires employees returning from medical leave to submit a Return-to-Work form completed by their physician, who also is provided with the Mechanic Job Description and Physician Demands Analysis (collectively, the "Return-to-Work Paperwork"). *Id.* ¶98. This

documentation confirms the physician has reviewed the job duties and physical demands and assessed the employee's ability to perform them with or without restrictions. *Id.* Without it, Otis cannot determine whether the employee can safely perform the essential functions of the role. *Id.* Bateman did not submit any notes on the required Return-to-Work Paperwork. *Id.*

While Bateman was on leave, Otis continued to search for a reasonable accommodation related to Bateman's ASD and ADHD diagnoses. *Id.* ¶¶85, 99, 104, 107-112, 124. Demshar searched outside of the Construction Department for Union job openings in the Service, Modernization, and Repair Departments that could potentially comport with Bateman's restrictions, as jobs within those Departments can sometimes be quieter than in Construction. *Id.* ¶¶120, 124. She even searched for job openings at different Otis branches. *Id.* ¶¶111-12.

On August 6, 2021, Bateman submitted his Return-to-Work Paperwork to Demshar, indicating a return date of August 9, 2021. *Id.* ¶103. Given Bateman's prior conflicting medical notes, Demshar determined it was prudent for Otis's consulting physician, Dr. Longphre, to consult with Bateman's providers. *Id.* ¶107. As a result of those discussions, on September 14, 2021, Bateman was cleared to return to work with respect to his foot injury. *Id.* ¶¶108-110, 115-17. He remained on leave, however, while Otis continued its interactive process to identify a reasonable accommodation for his ASD and ADHD. *Id.* ¶100. As part of that process, Dr. Longphre contacted Dr. Craig, Bateman's treating physician, to clarify his limitations and potential accommodations. *Id.* ¶¶128-29.

Just a few weeks later, on October 20, 2021, Bateman abandoned the interactive process and accepted a new position as an Assistant Mechanic at a different company where he would perform repair, testing, service, and modernization work, though he did not tell anyone at Otis. *Id.* ¶¶133-34.[5] Bateman resigned from Otis effective November 4, 2021. *Id.* ¶135.

---

[5] To Bateman's knowledge, this other elevator company did not do construction work. *Id*. ¶134. He stayed at the other elevator company for less than one year, then left the industry to go to law school and later join a well-known global law firm in New York City. *Id.*

Otis did not hire any Assistant Mechanics in the Service, Modernization, or Repair Departments in Local 4's territories while Bateman was on leave. *Id.* ¶138.

## III.    ARGUMENT

The undisputed facts show that the EEOC cannot establish the essential elements of any of its claims. Accordingly, Otis is entitled to judgment as a matter of law. *Bryant v. Caritas Norwood Hosp.*, 345 F. Supp. 2d 155, 162 (D. Mass. 2004); Fed. R. Civ. P. 56(c).

### A.    The EEOC's Failure to Accommodate Claim Fails As a Matter of Law.

To establish a claim for failure to accommodate, the EEOC must put forth sufficient evidence for a reasonable jury to find that (1) Bateman was disabled within the meaning of the ADA, (2) Bateman was a qualified individual, *i.e.* able to perform the essential functions of the position with or without reasonable accommodation, and (3) Otis, despite knowing of Bateman's disability, did not reasonably accommodate it. *Flaherty v. Entergy Nuclear Ops., Inc.*, 946 F.3d 41, 55 (1st Cir. 2019).

The undisputed evidence makes clear that (1) Bateman is not a qualified individual under the ADA, (2) no reasonable accommodation existed that would have permitted Bateman to perform the essential functions of his job, and (3) granting Bateman's accommodation request would have imposed an undue hardship on Otis. Accordingly, the EEOC's claim for failure to accommodate fails as a matter of law.

#### 1.    The EEOC Cannot Establish a *Prima Facia* Case for Failure to Accommodate

##### a.    Bateman Is Not a Qualified Individual Because He Could Not Perform the Essential Functions of His Position With or Without Accommodation and Because He Posed a Direct Threat to Himself and Others

Bateman's inability to perform the essential functions of his job precludes the EEOC's claim for failure to accommodate. An essential function is a "fundamental job duty of the position at issue . . . [t]he term does not include 'marginal' tasks, but may encompass 'individual or

idiosyncratic characteristics' of the job." *Kvorjak v. Maine*, 259 F.3d 48, 55 (1st Cir. 2001) (citations omitted). Courts give a "significant degree" of deference to an employer's business judgment about the necessities of a job. *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012).

An employee is also not a "qualified individual" under the ADA if he poses a "direct threat" to the health or safety of others in the workplace. 42 U.S.C. § 12113(b). The statute defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). Regulations have extended the definition of "direct threat" to include threats to the worker himself. *See* 29 C.F.R. § 1630.2(r). In determining whether an individual would pose a direct threat, the factors to be considered include (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the imminence of the potential harm. *Id*. "Where [plaintiff's] essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others." *Adams v. Mass. Gen. Brigham Inc.*, No. CV 21-11686-FDS, 2023 WL 6318821, at *8 (D. Mass. Sept. 28, 2023) (citing *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997)).

Bateman's alleged disabilities rendered him incapable of performing the essential functions of his job and posed a significant risk of harm to himself and others. Bateman worked as an *Assistant* Mechanic in Otis's Construction Department—Massachusetts law forbade him from working alone, as he was not a licensed mechanic. SOF ¶¶41, 131. In this role, he worked on active construction sites at heights and alongside other mechanics as well as multiple other trades outside of Otis's control. SOF ¶¶6, 28, 39. One of the essential functions of Bateman's role was to maintain a high level of concentration in what could be a loud, cacophonous environment, while performing physically-demanding and inherently dangerous work that could include lifting up to 100 pounds. SOF ¶¶6-7.

8

Bateman affirmatively raised that his medical conditions prevented him from safely performing these functions. Just four weeks into his employment, Bateman told Otis that his work environment was "not safe" because of his limitations. SOF ¶22. Bateman repeated this refrain again in a submission to myHR when he called his current assignment "problematic" and reported "two potentially very unsafe situations" stemming from limitations posed by his disabilities. *Id.* ¶23. Bateman also asked Otis to "hurry the [accommodation] process" because he was "concerned [his] luck will run out and a serious incident will occur." *Id.*

Bateman's own medical providers emphasized these concerns. Dr. Stephanie Craig, a psychologist, collaborated with Bateman to complete an ADA Accommodation Request Form explaining that his diagnoses resulted in a "heightened sensitivity to sound and a vulnerability to distraction." *Id.* ¶33. Dr. Craig explained which "essential job function(s) listed in the job analysis" Bateman was "having trouble performing because of the limitations:"

> Mr. Bateman is having difficulty concentrating on the intricacies of his job when there is a lot of conversation and commotion surrounding him. Additionally, while Bateman is able to perform his job functions in environments where there is a loud background noise, his hypersensitivity to sound and difficulty distinguishing critical auditory stimuli makes it difficult to distinguish which voices or noises it is important to attend to – like selecting which channel to listen to. **He may not be able to distinguish someone calling or warning him of an *immediate danger*.**

*Id.* ¶34 (emphasis added). Dr. Craig further explained, "**Mr. Bateman's difficulty sorting out which voices or noises to attend to makes it *particularly dangerous in environments where there is a potential for physical harm*, as he may not be able to distinguish someone calling or warning him of an immediate danger, or not in time.**" SOF ¶35 (emphasis added). Unfortunately, the safety concerns raised by Bateman and Dr. Craig were borne out. Shortly after providing the ADA Paperwork, Bateman retroactively reported to Otis that, in early March, he did not hear a warning call before a rail fell on his foot, resulting in three fractures. *Id.* ¶67.

The limitations identified by Bateman and his medical provider, together with his on-the-job injury under the very circumstances he had warned about, were incompatible with the essential

9

functions of an Assistant Elevator Mechanic working on construction sites. By their nature, construction sites are loud, disruptive, and unpredictable, and mechanical work on elevators performed alongside multiple trades on busy construction sites, at heights, and near hazardous electrical equipment, pose extreme risks of harm. Courts around the country have recognized the innate dangers of work environments involving the use of heavy or dangerous machinery. *See Moses v. Am. Nonwovens, Inc*., 97 F.3d 446, 447-48 (11th Cir. 1996) (epileptic worker who worked close to fast-moving and high-temperature machinery was a direct threat); *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 886-87 (9th Cir. 2001) (diabetic employee who operated equipment that produced, stored, and transferred liquid chlorine posed a significant risk under direct-threat framework); *Darnell v. Thermafiber*, *Inc*., 417 F.3d 657, 661 (7th Cir. 2005) (diabetic plaintiff with risk of passing out was a direct threat where employees were required to climb tall ladders, operate dangerous machinery, and help lift heavy equipment, despite working for ten months without incident); *Jackson v. Boise Cascade Corp*., 941 F. Supp. 1122, 1127 (S.D. Ala. 1996) (finding a plaintiff with narcolepsy and sleep apnea who used a front-end loader in the course of his job was a direct threat where "[a] constant state of alertness is a common sense essential element" to the plaintiff's job, noting "[a]n employer is not required to wait until an employee injures someone or damages equipment to terminate an employee who exhibits work attributes that could cause an accident."); *Clark v. Se. Penn. Transp. Authority*, No. CIV.A. 06-4497, 2008 WL 219223, at *10 (E.D. Penn. Jan. 25, 2008) *aff'd*, 306 F. App'x 796 (3d Cir. 2009) (mechanic with seizure condition was a direct threat to himself and others due to "safety sensitive position" that involved using heavy equipment, working at heights, and operating commercial vehicles); *see also Texas Dep't of Pub. Safety v. Callaway*, No. 24-0966, 2026 WL 969173 (Tex. Apr. 10, 2026) (similar).

The analysis leads to the same conclusion here. Given the limitations laid out by Bateman and his medical provider, it is indisputable that his conditions both prevented him from performing

the essential functions of his job and posed a significant and established risk of serious injury or death to himself and others. Because no accommodation could overcome these challenges and allow Bateman to perform the essential functions of his job, Bateman was not a qualified individual under the ADA, and the EEOC's claim fails as a matter of law.

### b.    No Reasonable Accommodation Existed

Even if the EEOC could establish that Bateman was a qualified individual, which he was not, the EEOC must also establish that Otis was aware of Bateman's disabilities and did not reasonably accommodate them. The EEOC bears the burden to show that a requested accommodation is "reasonable on its face" under the circumstances. *US Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). "[T]o show that a proposed accommodation is reasonable, a plaintiff must demonstrate that it 'would enable [him] to perform the essential functions of [his] job' and would be 'feasible for the employer under the circumstances.'" *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) (quote omitted); *see also Reed v. LePage Bakeries, Inc.*, 244 F.3d 254 (1st Cir. 2001). Bateman and his medical provider requested, broadly, that he be "re-assigned to a role or environment with fewer competing auditory inputs."

Given the record evidence, the EEOC cannot establish the existence of any reasonable accommodation that would have permitted Bateman to safely perform his job that would not have posed an undue hardship to Otis. During the period when Bateman was recovering from his foot injury (March through September 2021), he could not perform his role of Assistant Mechanic in the Construction Department. While Otis was initially able to find some different intermittent work for Bateman for a brief period in order to keep Bateman busy (and working), that work ran out— and it was not the work of an Assistant Mechanic, nor was it the type of work covered by the CBA. *Id.* ¶¶77-78. Put another way, it was not a long-term solution or role that Otis could offer to Bateman. *See Kinghorn v. Gen Hosp. Corp.*, No. CIV.A. 11-12078-DPW, 2014 WL 3058291, at *9 (D. Mass. July 1, 2014) ("simply because the Center was willing to offer on a short term basis

11

the kind of rigid structure Plaintiff requested and required, does not mean that the ability to work independently without rigid structure is something other than an essential function of the position"); *see also Jones*, 679 F.3d at 17 ("[t]he fact that certain tasks associated with a particular position can be either reduced, reassigned, or reallocated . . . does not, by itself, render them non-essential to the position they were associated to in the first place.").

The EEOC further contends that Otis should have unilaterally created a new role for Bateman in a different department, at other Otis branches—or, astonishingly, even within different union Locals. Each of these arguments fail. First, while the EEOC has speculated throughout this litigation that Bateman could have worked in the Service, Modernization, or Repair departments at Otis without issue, witnesses testified that <u>all</u> jobs performed by Assistant Mechanics across Otis's departments can involve loud, cacophonous, and dangerous environments. *Id.* ¶¶6, 21, 39, 122, 123. In addition to the fact there is no evidence Bateman could have safely worked in those departments, the indisputable evidence shows Otis searched for roles in those departments for Bateman, but there were no open positions in those departments in Local 4's territories during the relevant timeframe. *Id.* ¶124, 138. To prevail on its claim, the EEOC "must demonstrate that there is an actual vacant position to which []he can transfer. An employer is not required by the ADA to create a new job for an employee, nor to re-establish a position that no longer exists." *Audette v. Town of Plymouth, MA*, 858 F.3d 13, 20–21 (1st Cir. 2017) (quotations and citations omitted).

Moreover, the EEOC's contention that Otis could and should have searched for positions in other Locals' territories for Bateman is unreasonable because it flies in the face of the CBA, which plainly sets forth the process an employee must follow to transfer from one Local to another. It is undisputed that Bateman did not undertake that process. *See* SOF ¶139; *Eustace v. Springfield Pub. Schs*, 463 F. Supp. 3d 87, 117 (D. Mass. 2020) (reassignment in violation of the rules of a seniority system made the accommodation not reasonable). If Bateman had undertaken that

12

process, which he undisputedly did not, the process would additionally require the approval of the receiving Local, which is outside of Otis's control. SOF ¶11, n.5.

Finally, the EEOC speculates that Otis could have accommodated Bateman by assigning him to work with an adjuster, despite the fact that, according to Bateman, adjusters "almost always" do their work at construction sites, SOF ¶61, which are not safe environments for Bateman in light of his purported restrictions for all of the reasons discussed *supra*.

None of these proffered accommodations are feasible on their face or in practice. Bateman's hypersensitivity to sound, difficulty distinguishing critical auditory stimuli, and need for separation from others are incompatible with the role of an Assistant Elevator Mechanic. No accommodation would permit Bateman to perform the essential functions of his job, and Otis had no legal obligation to modify those essential functions. Because no reasonable accommodation existed, the EEOC's failure to accommodate claim must be dismissed. *Jones*, 679 F. 3d at 20.

### 2.   Accommodating Bateman Would Have Imposed an Undue Hardship on Otis

The EEOC's failure to accommodate claim further fails because its proffered accommodations—in addition to being unreasonable—would have imposed an undue hardship on Otis. Under the ADA, employers are not required to extend accommodations where doing so would place an undue hardship on the operation of their business. *See Barnett*, 535 U.S. at 396. "The undue hardship inquiry must take into account the context of the particular employer's business and the nature of operations." *Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 435 (D. Mass. 2021), *aff'd*, 32 F.4th 82 (1st Cir. 2022). "[F]actors to be considered as to undue hardship include the cost of the accommodation, the effect on expenses and resources, the impact of the accommodation on the operation of the facility (including on other employees' ability to do their jobs) and the impact on the facility's ability to conduct business." *Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 649 (1st Cir. 2000) (citing 29 C.F.R. § 1630.2(p)). This District has observed that "considerations include not only direct economic costs, but indirect ones

13

related to health and safety." *Together Emps.*, 573 F. Supp. 3d at 435 (citing U.S. Equal Emp. Opportunity Comm'n, WHAT YOU SHOULD KNOW ABOUT COVID-19 AND THE ADA, THE REHABILITATION ACT, AND OTHER EEO LAWS, § L (2021)).

Otis is in the business of developing, manufacturing, and installing elevators. SOF ¶1. Critical to Otis's business operations and reputation is the safety of its employees, customers, and passengers. *Id.* ¶3. As the world's largest elevator manufacturer, and with over 70,000 employees worldwide, Otis goes to great lengths to ensure a safe environment at all job sites. *Id.* ¶¶1, 3. A single slipup on a job site can pose grave dangers to those working or otherwise on site, including Otis employees, tradespeople who are not employed by Otis, and bystanders. These dangers are, unfortunately, not hypothetical. Nelson testified about on-the-job fatalities that happened in Service and Repair during his tenure with the company—in addition to life-altering limb loss injuries he was aware of in Construction—despite Otis's high safety standards. *Id.* . ¶¶42, 122. As set forth above, Bateman's conditions posed a direct threat to the safety of himself and others. None of the accommodations suggested by the EEOC in this litigation (which were not specifically proposed by Bateman or his medical provider(s) during the interactive process) would have eliminated that threat, which—if materialized into a significant injury or death—would have caused serious reputational harm to Otis. Otis had no obligation to put Bateman or other individuals in harm's way to accommodate Bateman.

In addition to the hardship posed by safety and reputational considerations, Bateman's proposed accommodations would have been logistically impracticable to the point of creating an undue hardship for Otis. Because Assistant Mechanics in Construction like Bateman worked on job sites alongside workers from other trades—workers and work that Otis did not control—and because construction sites are, by their nature, evolving each day, it is no exaggeration to say that the Otis managers tasked with doling out assignments each week could not possibly predict whether any particular assignment would comport with Bateman's restrictions. *Id.* ¶6, 26-28, 39.

14

There was no reasonable way for Otis to ensure that Bateman could safely work at any given worksite from one day—or even one minute—to the next because any sudden change in the volume of activity and sound could create the circumstances that Bateman and his medical provider warned would be dangerous. The EEOC ostensibly expected Bateman's supervisors to assess each potential assignment for an Assistant Mechanic at Otis job sites in the region on a daily basis (including those overseen by different managers staffed by different locals), somehow assess the level of noise and other competing inputs of each potential job site, and determine whether such an environment would sufficiently accommodate Bateman. The challenges of such a herculean task would be further exacerbated by Bateman's inability to articulate any kind of noise threshold under which he could safely perform his job. *Id.* ¶¶31-36; 129-30.

In the EEOC's view, Bateman's supervisors were obligated to dedicate most—if not all— of their time to accommodating Bateman, neglecting the essential functions of their own roles, all while running the risk of improperly assessing whether an assignment was consistent with Bateman's indeterminate needs and potentially bearing the responsibility of a resulting catastrophic injury. The law does not require that. *See Bryant*, 345 F. Supp. 2d at 171 (accommodation that caused "deleterious impact on the ability of [the plaintiff's] co-workers to do their own jobs" posed an undue hardship); *Kvorjak*, 259 F.3d at 57 ("The law does not require an employer to 'accommodate a disability by foregoing an essential function of the position or by reallocating essential functions to make other workers' jobs more onerous.'") (quoting *Feliciano v. State of R.I.*, 160 F.3d 780, 785 (1st Cir. 1998)).

Further, given the dynamic nature of construction sites, a change in noise levels at any given moment may have required Bateman to cease working, causing a domino effect of delays and substantial financial losses to Otis. This time-consuming process of identifying potential assignments that would accommodate Bateman, then monitoring the assignment continuously to ensure that changing conditions (including work performed by other contractors and trades outside

15

of Otis's control) did not impact Bateman's ability to perform the essential functions of the job, would have a detrimental effect on Otis's business to the point of creating an undue hardship. Because Otis could not have provided a reasonable accommodation to Bateman absent an undue hardship to its business operations, the EEOC's claim fails as a matter of law.

**B.      The EEOC's Claim for Failure to Engage in the Interactive Process Fails as Matter of Law**

The First Circuit has noted "[t]he scope of the employer's obligation in this [interactive] process is not crystal clear." *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 109 (1st Cir. 2005) (alterations in original) (quoting *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 23–24 (1st Cir. 2004)); *see also EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 132 (1st Cir. 2014) (quoting *Enica v. Principi*, 544 F.3d 328, 338 (1st Cir. 2008)) (emphasis added) ("an employee's request for accommodation *sometimes* creates 'a duty on the part of the employer to engage in an interactive process.'"). Generally, "[t]he interactive process involves an informal dialogue between the employee and the employer in which the two parties discuss the issues affecting the employee and potential reasonable accommodations that might address those issues." *Buccieri v. Brewster Ambulance Serv., Inc.*, 792 F. Supp. 3d 273, 281 (D. Mass. 2025) (quoting *Kohl's*, 774 F.3d at 132). The process "requires bilateral cooperation and communication." *Kohl's,* 774 F.3d at 132. "If an 'employee fails to cooperate in the process, then the employer cannot be held liable under the ADA for a failure to provide reasonable accommodations." *Buccieri*, 792 F. Supp. 3d at 281 (quoting *Ortiz-Martinez v. Fresenius Health Partners, PR, LLC*, 853 F.3d 599, 605 (1st Cir. 2017) ("Claims arise when there is no process at all or there is a breakdown in the process."). *Id.*

It is well established in the First Circuit that an employer cannot be held liable for failure to engage in an interactive process unless a reasonable accommodation could have been found. *Buccieri*, 792 F. Supp. 3d at 282 (citing *Jones*, 696 F.3d at 91) (quoting *Kvorjak*, 259 F.3d at 52 (liability for failure to engage in an interactive process "depends on a finding that, had a good faith interactive process occurred, the parties could have found a *reasonable accommodation* that would

16

enable the disabled person to perform the job's essential functions") (emphasis in original); *Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 133 (1st Cir. 2017) (citing *Lang v. Wal-Mart Stores E., L.P.*, 813 F.3d 447, 456 (1st Cir. 2016)) (where "the employee fails to satisfy her burden of showing a reasonable accommodation existed, the employee cannot maintain a claim for failure to engage in an interactive process"). The record is clear that Bateman was unable to perform the essential functions of his job, that he posed a direct threat to himself and others, that no reasonable accommodation would have changed that, and that the accommodations suggested by the EEOC during this litigation would have been both ineffective and created an undue hardship for Otis. Because no reasonable accommodation existed, the EEOC cannot maintain a claim that Otis failed to engage in the interactive process. *See Buccieri*, 792 F. Supp. 3d at 282 (granting employer motion for judgment as a matter of law, holding that where jury found that requested accommodation would have created an undue hardship and/or posed a direct threat, "any interactive process would not have been fruitful, and [the employer] cannot be liable for disengaging in the interactive process when it concluded it could not provide [] a reasonable accommodation").

Even if the EEOC could somehow establish that Bateman was a qualified individual and that a feasible reasonable accommodation existed—which it cannot—Otis's efforts to engage with Bateman to identify a reasonable accommodation exceeded any legal obligation. The record evidence speaks for itself. Otis tried for <u>more than six months</u> to identify a workable accommodation for Bateman—a task made much more complicated by the conflicting information Bateman and his medical provider conveyed to Otis about his purported limitations and Bateman's March 2021 foot injury and related months-long leave of absence.

While the EEOC contends that Otis could have or should have done something different or more, on this record, it cannot earnestly dispute that Otis tried hard to accommodate Bateman. Demshar engaged in verbal and written communications with Bateman to better understand his

17

limitations, and she worked diligently behind the scenes, coordinating with Bateman's supervisors in an attempt to identify vacant positions and seeking input from a consultant physician on multiple occasions. SOF ¶¶43-132. That physician further contacted Bateman's medical providers directly to clarify gaps and inconsistencies in the letters provided to Otis. SOF ¶¶128-29. Bateman's delayed submission of ADA and Return-to-Work Paperwork, combination of mental and physical conditions, inconsistent doctor's notes, and ever-changing limitations significantly encumbered Otis's efforts to identify a feasible accommodation. SOF ¶¶34, 35 81-92, 103.  Despite these challenges, Otis remained committed to trying to identify a reasonable accommodation up until Bateman's voluntary resignation. At the time of his resignation, Bateman had not yet provided clear or consistent information regarding his limitations, SOF ¶¶125-32, demonstrating his own failure to engage in the interactive process.[6] *See Svoboda v. TimkenSteel Corp.*, No. 5:18CV01443, 2020 WL 1513710, at *11 (N.D. Ohio Mar. 30, 2020 ("Svoboda did not provide any evidence to contradict the necessity of the information, and he never provided a medical opinion regarding what level or type of protection he required. Accordingly, Svoboda cannot point to any genuine issue of material fact to establish that he complied with the ADA-mandated interactive process.").

Where Otis engaged in an extensive interactive process with Bateman, and where that process revealed that no reasonable accommodation existed, the EEOC's claim fails as a matter of law. *See DeCaro v. Hasbro, Inc.*, 580 F.3d 55, 63 (1st Cir. 2009) ("an employer's duty to accommodate does not arise unless (at a bare minimum) the employee is able to perform the essential functions [] with an accommodation"); *Soto-Ocasio v. Fed. Exp. Corp.*, 150 F.3d 14, 19 (1st Cir. 1998) (employer not liable for failing to engage in interactive process where no reasonable accommodation possible); *see also Haynes v. Reddy Ice, LLC*, No. 1:21-CV-5246-MLB-JSA, 2024 WL 1589321, at *17 (N.D. Ga. Jan. 8, 2024), report and recommendation adopted, No. 1:21-CV-5246-MLB, 2024 WL 964170 (N.D. Ga. Mar. 6, 2024) ("[W]hen a plaintiff fails to

---

[6] Bateman's withdrawal from the process is unsurprising, given his indication to a union representative in July 2021 during his leave that he did not wish to return to Otis. SOF ¶90.

demonstrate the existence of a reasonable accommodation, 'the employer's lack of investigation into reasonable accommodation is unimportant.'") (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)).

### C.      The EEOC's ADA Retaliation Claim Fails as a Matter of Law

To establish a retaliation claim under the ADA, the EEOC must establish that (1) Bateman engaged in activity protected by the statute; (2) Otis took a materially adverse action toward Bateman; and (3) there is a causal connection between the protected conduct and the materially adverse action. *Rivera v. Altranais Home Care LLC*, No. 3:19-CV-30139-KAR, 2022 WL 161583, at *17 (D. Mass. 2022). The EEOC's claim fails because it cannot establish the second or third element. The EEOC's retaliation claim additionally fails because the law is clear that a plaintiff cannot rebrand a failure to accommodate claim as a retaliation claim, as the EEOC attempts to do here. That is, an employer's alleged failure to accommodate cannot serve as the adverse action underpinning a retaliation claim. *Rivera*, 2022 WL 161583, at *17; SOF ¶¶140-41. Otis does not dispute that Bateman engaged in a protected activity under the ADA when he submitted an accommodation request to Otis. Otis vigorously disputes that it took any materially adverse employment action toward Bateman following his request for accommodation—let alone that it took any adverse action toward Bateman *because* he requested a workplace accommodation.

Bateman submitted his ADA Paperwork to Otis during the first week of April 2021. SOF ¶31. A few weeks later, he retroactively reported that he suffered a workplace injury in March 2021. *Id.* ¶68. In May 2021, while Otis was actively engaged in trying to get clarity about Bateman's disability-related limitations in order to see if any reasonable accommodation existed that might allow him to perform the essential functions of his job without endangering himself and without causing under hardship to Otis, Bateman began a leave of absence related to the foot injury. *Id.* ¶¶79-80. Bateman was not fully cleared to return to work from the foot injury until September 2021. *Id.* ¶117. Five weeks later, while Otis continued to engage in the interactive process with

Bateman related to his accommodation request, Bateman started a new job with a different employer. *Id.* ¶¶133-35.

Otis did not take any adverse action toward Bateman—just the opposite: Otis worked hard to identify a reasonable accommodation for Bateman in a complex environment. In contrast, Bateman told the Union <u>in July 2021</u> that he did not want to return to work at Otis. *Id.* ¶90. That is consistent with the fact that he started a new job in October 2021 and then formalized his voluntary resignation from Otis on November 4, 2021.

Because Otis did not take any adverse action against Bateman, the EEOC attempts to recast its failure-to-accommodate claim as a retaliation claim by characterizing the alleged failure to accommodate as an adverse action. *See* SOF ¶¶140-41. The law does not allow that. *See Incutto v. Newton Pub. Schs.*, No. CV 16-12385-LTS, 2019 WL 1490132, at *5 (D. Mass. Apr. 4, 2019) ("[T]o the extent that [Plaintiff] alleges that the failure to provide her with at least two days of leave after October 2013 was retaliation for requesting such leave, she is simply repackaging her failure to accommodate claim into a retaliation claim. This she may not do."); *see also Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 90 (D. Conn. 2006); *Missick v. City of N.Y.*, 707 F. Supp. 2d 336, 356–57 (E.D.N.Y. 2010).

Because Otis did not take any materially adverse against Bateman, EEOC's retaliation claim fails at the threshold *prima facie* stage. The retaliation claim should be dismissed.

IV.    **CONCLUSION**

For the foregoing reasons, Defendants Otis Worldwide Corporation and Otis Elevator Company respectfully request that the Court grant their motion for summary judgment and dismiss the EEOC's lawsuit, with prejudice.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via first class and electronic mail to those indicated as non-registered participants on July 1, 2026.

*/s/ Emily J. Miller*
